UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALEJANDRO RAMIREZ, an individual,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an Indiana non-profit,<br><br>Defendant. | Case No. 4:26-cv-00542-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |
| VILIAMI TU'AKOI, an individual,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an Indiana non-profit,<br><br>Defendant. | Case No. 4:26-cv-00553-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

These cases are two of many similar cases nationwide that seek to enjoin Defendant National Collegiate Athletic Association ("NCAA") from enforcing its eligibility limitation bylaws (the so-called "Five-Year Rule") so the student-athletes may participate additional years in NCAA Division I sports (the highest level of competitive collegiate sports) ("Division I"). Generally, the Five-Year Rule grants Division I student-athletes a maximum of four playing opportunities over five consecutive years, starting at the time the student-athlete first enrolls at a collegiate institution, including two-year institutions and

even if that institution is not a member of the NCAA, such as junior colleges ("JUCO").

Plaintiffs Alejandro Ramirez ("Ramirez") and Viliami Tu'akoi ("Tu'akoi") are students at Idaho State University ("ISU")—a Division I school—and members of the ISU football team. Each formerly enrolled and played football at JUCO before transferring to a Division I school. As such, they were given fewer years of eligibility to participate in Division I football than their fellow student-athletes who enrolled directly at a Division I school. Through their motions for preliminary injunction (the "Motions"),[1] Plaintiffs seek to stop the NCAA from counting their years enrolled at JUCO toward their years of Division I eligibility so they may be eligible to play in the 2026–27 season and receive scholarship funds to continue their education.

The Court issued temporary restraining orders ("TRO") against the NCAA while it considered Plaintiffs' Motions. Following a hearing, the Court took the Motions under advisement and extended the TROs until it could issue a decision on the Motions. On September 9, 2026, the Ninth Circuit issued its decision in *Blythe v. NCAA*, -- F.4th --, 2026 WL 2653349 (9th Cir. Sept. 9, 2026), which explained its reasoning for vacating a district court's preliminary injunction against the NCAA from enforcing the Five-Year Rule against a former National Association of Intercollegiate Athletics ("NAIA") student-athlete.[2] The Court requested supplemental briefing on the Ninth Circuit's *Blythe* decision

[1] The Motions were filed in two separate cases: *Ramirez v. NCAA*, Case No. 4:26-cv-00542-DCN, Dkt. 2 (D. Idaho), and *Tu'akoi v. NCAA*, Case No. 4:26-cv-00553-DCN, Dkt. 5 (D. Idaho). Because Plaintiffs filed essentially the same Motions and exhibits in support thereof, the Court will cite to only one docket even if a corresponding citation exists on the other docket. Citations to the docket are to the *Ramirez* docket unless otherwise indicated.

[2] The NAIA is a governing body that oversees college athletics for smaller colleges and universities, and is entirely separate from the NCAA.

and the implications, if any, it has on Plaintiffs' Motions. Dkt. 19. The parties submitted supplemental briefing on September 14, 2026, and the Motions are now ripe for review.

For the reasons set forth below, the Court has no choice but to DENY the Motions.

## II. BACKGROUND

### A. Factual Background[3]

#### *1. The NCAA and the Five-Year Rule*

The NCAA is an unincorporated corresponding association in Indianapolis, Indiana, that governs over 1,100 member institutions spread across three autonomous divisions, with approximately 350 institutions in Division I. Approximately 180,000 student-athletes compete in Division I across 26 sports. Only four-year institutions can be members of the NCAA. Thus, JUCOs are not, and cannot, be members of the NCAA. NCAA members adopt rules to govern NCAA intercollegiate athletics aimed at ensuring fair and inclusive athletic competition and academic opportunities for student-athletes. The rules governing Division I athletics (the "Bylaws") include rules concerning a student-athlete's eligibility to compete at a NCAA Division I member institution. Article 12.6 of the Bylaws (i.e., the Five-Year Rule) limits a student-athlete to four seasons of competition within a five-year period, with the clock starting at full-time enrollment in college and counting seasons of competition at four-year and two-year institutions, even if those institutions are not

---

[3] The Court is not making factual findings at this time but provides this background section as a courtesy to the reader. The following background is put together from the complaints, Motions, briefing, and exhibits thereto.

members of the NCAA.[4] The Five-Year Rule states, in relevant part:

> A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.3 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the student-athlete completes all seasons of participation in all sports within the time periods specified below.
>
> . . . A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum fulltime program of studies in a collegiate institution . . . .

Dkt. 2-7, at 61. In short, a student-athlete's eligibility runs out when a student has either competed in four seasons, or five years have passed from the time the student first enrolls at a collegiate institution, whichever comes sooner. Although JUCOs are not NCAA members and cannot be a Division I institution, enrolling and competing at a JUCO starts the clock and counts toward a student-athlete's four seasons of competition under the Five-Year Rule. Thus, a student-athlete who enrolls and competes at a JUCO before transferring to a Division I institution has fewer seasons and years of eligibility to compete in Division I than student-athletes who enroll directly at a Division I institution.

There are certain exceptions that can extend or waive the Five-Year Rule for a period of time. Those include (but are not limited to) time spent in military, religious, or foreign-aid service; academic study abroad; internships; or if a female student-athlete becomes pregnant. *Id.* at 61–62. The NCAA may also waive the Five-Year Rule for a student-athlete who is "deprived of the opportunity to participate for more than one season

[4] In 2026, the NCAA replaced the Five-Year Rule with an age-based eligibility rule. Because Plaintiffs graduated high school in 2021 and (according to the NCAA) exhausted their eligibility under the Five-Year Rule, the new age-based eligibility rule does not apply to them. Plaintiffs do not argue otherwise.

in his or her sport within the five-year period of eligibility for reasons that are beyond the control of the student-athlete or institution," or who is redshirted for one season by the institution and is deprived of an opportunity to compete in one other season due to circumstances beyond the student-athlete's control. *Id.* at 63.

*2. Ramirez*

Ramirez is a 23-year-old master student at ISU and offensive lineman on ISU's football team. In 2021, after graduating high school, Ramirez joined the Modesto Junior College ("Modesto") football team and competed in the 2021–22 season. Modesto is a JUCO and not a member of the NCAA. Following the 2021-22 season, Ramirez pursued opportunities to transfer to a Division I program but decided to return to Modesto for another season after being told (erroneously) that the NCAA Eligibility Center had labeled him a "nonqualifier," meaning he did not meet the requirements to transfer and compete at a Division I institution in the same year. *See* Dkt. 2-6, at 2. Following the 2022–23 season, Ramirez transferred to ISU—a Division I member—and joined their football team, where he competed in the 2023–24 season. Ramirez redshirted (*i.e.*, sat out) the 2024–25 season due to a season-ending injury (ACL). In 2025, Ramirez was medically cleared and competed in the 2025–26 season. He practiced with the ISU football program throughout the spring of 2026 in preparation for this upcoming football season and has been elected captain of the team in anticipation of his ability to play in the upcoming season.

Since transferring to ISU, Ramirez has benefited from athletic financial aid, which allowed him to complete his bachelor's degree and pursue a master's degree while playing football. In hopes of completing his master's degree, Ramirez requested that ISU submit a

one-year eligibility waiver application to the NCAA on his behalf. In anticipation of Ramirez obtaining a waiver to compete in the 2026–27 season, ISU offered Ramirez a financial aid package with a total earning potential of $94,150, including scholarship funds for his master's program. ISU submitted the eligibility waiver application in July 2026, citing Ramirez's years at a JUCO program (including an additional year due to erroneous recruiter advice) and his incapacitating injury in 2024 as justification for the waiver.

The NCAA denied the waiver on July 16, 2026, finding that Ramirez already had four participation opportunities in the 2021–21 (JUCO), 2022–23 (JUCO), 2023–24 (Div. I), and 2025–26 (Div. I) seasons, and that he has exhausted his five-years of eligibility. It is unclear whether ISU appealed that decision. Without the waiver, Ramirez is ineligible to compete on the ISU football team and unable to sign the financial aid package and receive the scholarship funds for his master's program.

*3. Tu'akoi*

Tu'akoi is a 23-year-old undergraduate student at ISU and defensive lineman on ISU's football team. In 2021, after graduating high school, Tu'akoi joined the Independence Community College ("ICC") football team. ICC is a JUCO and not a member of the NCAA. When Tu'akoi was recruited by ICC, he was told he was a "qualifier" and would be able to begin competing immediately. *Tu'akoi* Dkt. 1 ¶ 73. However, upon arriving on campus, he discovered he was 0.75 credits short of being a "qualifier," so Tu'akoi redshirted the 2021–22 season to focus on his academics. *Id.* ¶ 74. The next year, Tu'akoi competed for ICC in the 2022–23 season. Following the 2022–23 season, Tu'akoi explored opportunities to transfer to a Division I program. After receiving

full-ride scholarship offers from both Utah State University ("Utah State") and ISU, Tu'akoi transferred to Utah State—a Division I member—and joined their football team, where he competed in the 2023–24 season. At the end of the 2023–24 season, Tu'akoi entered the transfer portal and received full-ride scholarship offers from Utah Tech University, Southern Utah University, Weber State University, and ISU, all Division I members. Tu'akoi chose to transfer to ISU where he redshirted the 2024–25 season and competed in the 2025–26 season. He practiced with the ISU football program throughout the spring of 2026 in preparation for this upcoming football season.

Since transferring to NCAA Division I schools, Tu'akoi has benefited from athletic financial aid, which allowed him to complete all but one semester of his bachelor's degree while playing football. In July 2026, ISU submitted a one-year eligibility waiver application to the NCAA on Tu'akoi's behalf, citing Tu'akoi's years at a JUCO program (including sitting out his first year due to being a "nonqualifier") and his redshirt year during the 2024–25 season as justification for the waiver. If Tu'akoi is declared eligible for the 2026–27 season, he will receive a full-ride scholarship similar to ones he received in previous years (approximately $20,000 in 2025).

The NCAA denied the waiver on August 20, 2026, finding that Tu'akoi exhausted his years of eligibility because Tu'akoi first enrolled at JUCO in 2021, even though he redshirted the 2021–22 season for academic reasons. It is unclear whether ISU appealed that decision. Without the waiver, Tu'akoi is ineligible to compete on the ISU football team and will not receive scholarship funds to complete his bachelor's program.

**B. Procedural History**

On August 21, 2026, one week before the ISU football team's season opener, Ramirez filed his complaint against the NCAA, alleging the Five-Year Rule's eligibility limitations violates Section I of the Sherman Act, 15 U.S.C. § 1. Dkt. 4. In particular, Ramirez alleges that by counting the years a student-athlete enrolls and competes at the JUCO against their years of eligibility to play at a Division I school, the NCAA unlawfully restricts the labor market for Division I athletes, which negatively impacts a former JUCO student-athlete's ability to compete, receive financial aid, and earn compensation through the use of their name, image, and likeness ("NIL") while competing in Division I. *Id.* ¶ 4. At bottom, Ramirez requests the Court declare the JUCO eligibility limitation violates Section 1 of the Sherman Act and issue a permanent injunction against the NCAA from enforcing the Five-Year Rule as it relates to counting time spent at JUCOs against the student-athlete. *Id.* at 17. Along with his complaint, Ramirez filed a Motion for Temporary Restraining Order and/or Preliminary Injunction (Dkt. 2, the "Ramirez Motion"), requesting immediate injunctive relief against the NCAA from enforcing the Five-Year Rule's JUCO eligibility limitation against him so that he may compete in ISU's 2026–27 season.

On August 26, 2026, only three days before the ISU football team's season opener, Tu'akoi filed his complaint against the NCAA, alleging the same violations of the Sherman Act and seeking the same relief. *Tu'akoi* Dkt. 1. Tu'akoi similarly filed a Motion for Temporary Restraining Order and/or Preliminary Injunction (*Tu'akoi* Dkt. 5, the "Tu'akoi Motion"), seeking the same injunctive relief.

On August 27, 2026, the Court granted in part the Ramirez Motion. Dkt. 16 (the "Ramirez TRO"). The Court granted the motion to the extent Ramirez sought a TRO and held in abeyance Ramirez's request for a preliminary injunction pending a hearing on his motion. *Id.* The TRO was based, in part, on the Court's finding that there was a likelihood of success on the merits. *Id*.

On August 28, 2026, the Court granted in part the Tu'akoi Motion to the same extent and for the same reasons set forth in the Ramirez TRO. *Tu'akoi* Dkt. 12.

Due to the overlapping issues of fact and law among the complaints and Motions, and because the respective parties are represented by the same attorneys, the Court instructed the parties to submit consolidated briefing addressing both Motions. The NCAA submitted their response to the Motions on August 31, 2026 (Dkt. 17), and the Plaintiffs replied on September 2, 2026 (Dkt. 18).

A hearing on the Motions was held on September 4, 2026, at which the Court took the Motions under advisement and extended the TROs until it could issue its order on Plaintiffs' requests for a preliminary injunction. Dkt. 22.

On September 9, 2026, the Ninth Circuit issued its decision in *Blythe*, which explained its reason for vacating a lower court's injunction entered April 8, 2026. *See* 2026 WL 2494580 (order vacating injunction).[5] There, a former NAIA college baseball player sued the NCAA, alleging the Five-Year Rule violated Section I of the Sherman Act, and

[5] Also on September 9, 2026, the Ninth Circuit vacated two other district court decisions that had granted similar preliminary injunctions. *See Braham v. NCAA*, -- F.4th --, 2026 WL 2653095, at *4 (9th Cir. Sept. 9, 2026) (dismissing appeal of the injunctions as moot and vacating the district courts' orders pursuant to the doctrine of *Munsingwear* vacatur).

he moved for a preliminary injunction so he could participate in the 2026 baseball season at a Division I school. *Id.* at *2–3. The district court granted his motion. *Id.* at *3. The NCAA appealed and sought expedited resolution of its appeal. *Id*. After oral argument in April 2026, the Ninth Circuit vacated the injunction indicating a written opinion would follow. *Id.*

On September 10, 2026, this Court requested supplemental briefing on the implications, if any, *Blythe* has on Plaintiffs' Motions. Dkt. 19. The parties submitted supplemental briefing on September 14, 2026. Dkts. 20, 21.

## III. LEGAL STANDARD

"A preliminary injunction's purpose is to prevent irreparable harm that occurs before a court can render a decision on the merits." *Revelry Grp. LLC v. Jobe*, 2023 WL 3010224, at *3 (D. Idaho Apr. 18, 2023). "A preliminary injunction is an extraordinary equitable remedy that is never awarded as of right." *Garcia v. County of Alameda*, 150 F.4th 1224, 1229 (9th Cir. 2025) (citation modified). A party seeking a preliminary injunction must clearly demonstrate: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent injunctive relief; (3) that the balance of hardships tips in their favor; and (4) that an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit applies the *Winter* factors on a sliding scale. "Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original). A party that cannot show a likelihood of success on the the

merits may nonetheless obtain injunctive relief "if there are serious questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Serious questions are those "which cannot be resolved one way or the other at the hearing on the injunction." *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 926 (9th Cir. 2003) (cleaned up).

A preliminary injunction and a TRO generally serve the same purpose of "preserv[ing] the status quo *ante litem* pending a determination of the action on the merits." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980); *see also* Fed. R. Civ. P. 65. The status quo *ante litem* means "the last, uncontested status which preceded the pending controversy." *Regents of the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 514 (9th Cir.1984). Nevertheless, certain circumstances warrant divergence from the status quo.

There are two types of preliminary injunctions. A prohibitory injunction prohibits a party from taking an action and is intended to preserve the status quo. A mandatory injunction requires a party to act, "goes well beyond simply maintaining the status quo," and "is particularly disfavored." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (citation modified). "[M]andatory injunctions are not granted unless extreme or very serious damage will result"; they cannot be issued "in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation modified). A court may not issue a mandatory preliminary injunction unless "the facts and law clearly

favor the moving party." *Stanley*, 13 F.3d at 1320.

## IV. DISCUSSION

### A. Prohibitive vs. Mandatory

As an initial matter, the NCAA argues the injunctions Plaintiffs seek are mandatory because they alter the status quo by "requiring the NCAA to grant them an extra season of competition and year of eligibility that they do not have." Dkt. 17, at 8–9. At oral argument, Plaintiffs argued the injunction they seek is prohibitive because they are asking the Court to prevent the NCAA from enforcing the Five-Year Rule.

The Ninth Circuit has not provided clear guidance on whether this type of injunction is prohibitive or mandatory. *See Blythe v. NCAA*, -- F.4th --, 2026 WL 2653349, at *3 n.2 (noting that under either standard, the outcome would be the same). Other courts have found that requests for injunctive relief from the NCAA's eligibility rules are mandatory injunctions. *See, e.g.*, *Johnson v. NCAA*, 2025 WL 1790345, at *7 (D. Mont. June 26, 2025) (challenging the eligibility rules as applied to Division II athletes); *Coley v. NCAA*, 792 F. Supp. 3d 634, 648 (E.D.N.C. 2025) (challenging the four seasons within five years rule); *Brzovic v. NCAA*, 2025 WL 1370758, at *3 (D.S.C. May 11, 2025) (same). However, none of these cases involved former JUCO athletes or sought the specific relief Plaintiffs seek here.

In cases that considered challenges to the NCAA's JUCO eligibility limitation like the one presented here, courts are split as to whether such challenges are mandatory or prohibitive. *See, e.g.*, *Osuna v. NCAA*, 2025 WL 684271, at *2 (E.D. Tenn. Mar. 3, 2025) (treating the requested relief from the JUCO eligibility limitation as prohibitive); *Pavia v*

*NCAA*, 760 F. Supp. 3d 527, 536–37 (M.D. Tenn. 2024) (same); *Giles v. NCAA*, 2025 WL 2551093, at *7 (C.D. Cal. Aug. 18, 2025) (treating the requested relief form the JUCO eligibility limitation as mandatory); *Pate v. NCAA*, 2025 WL 3522111, at *4 (D. Ariz. Dec. 9, 2025) (same).

The Court tends to agree with Plaintiffs that the relief they seek is prohibitive, not mandatory. The root of Plaintiffs' requested relief is to *prevent* the NCAA from counting the years Plaintiffs spent at JUCO toward their years of eligibility under the Five-Year Rule. But for their years spent at JUCO, Plaintiffs would be eligible to compete in the 2026–27 season. Nevertheless, the Court need not decide the issue because like the Ninth Circuit, the Court finds that "[u]nder the typical standard of review applied to prohibitive injunctions or the heightened standard of review applied to mandatory injunctions, . . . the outcome of this case is the same." *Blythe*, -- F.4th --, 2026 WL 2653349, at *3 n.2.

**B. Likelihood of Success**

"Likelihood of success on the merits 'is the most important'" factor in determining whether a preliminary injunction should issue. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). This standard "does not require a plaintiff to show that it is more likely than not that it will win on the merits" but rather that "there is a substantial case for relief on the merits." *Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1218 (D. Idaho 2018).

The NCAA argues Plaintiffs are not likely to succeed on the merits of their claims on three independent grounds. First, the NCAA argues the actions should be dismissed or transferred to the Middle District of Tennessee under the first-to-file rule. Second, the

NCAA argues Plaintiffs' claims are barred by the settlement reached in *House v. NCAA*, Case No. 4:20-cv-03919 (N.D. Cal) (the "*House* Settlement"). Third, the NCAA argues Plaintiffs fail to show that the Five-Year Rule as applied to former JUCO student-athletes likely violates the Sherman Act. The Court discusses each ground in turn.

*1. Transfer of the Actions*

The Ninth Circuit employs a "first-to-file" rule to implement the principle that district courts have discretion to transfer, stay, or dismiss an action if the same parties and issues are already at issue in a proceeding before another district court. *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir. 1982). Courts consider three factors in determining whether to apply the first-to-file rule: (1) the chronology of the actions; (2) the similarity of the parties; and (3) the similarity of the issues. *Youngevity Int'l, Inc. v. Renew Life Formulas, Inc.*, 42 F. Supp. 3d 1377, 1381 (S.D. Cal. 2014).

Here, it is undisputed the Middle District of Tennessee cases cited by the NCAA (Dkt. 17 at 9-10, the "Tennessee Actions") were filed prior to the present actions. It is also undisputed that the issues in at least one of the Tennessee Actions and the present actions are similar.

When addressing similarity of the parties, "courts have held that the first-to-file rule does not require exact identity of the parties. Rather, the first-to-file rule requires only substantial similarity of parties." *Kohn L. Grp., Inc. v. Auto Parts Mfg. Miss.*, 787 F.3d 1237, 1240 (9th Cir. 2015). In the Tennessee Actions and the present cases before the Court, the defendant is the NCAA. There is no dispute the plaintiffs in the Tennessee Actions are not the Plaintiffs in the present actions and there is no relationship among them.

Nevertheless, the NCAA argues each of the plaintiffs in the Tennessee Actions are "similarly situated" to Plaintiffs—namely that they are former NCAA student-athletes seeking additional seasons of eligibility—and transfer is, therefore, appropriate. For support, the NCAA cites *Manu v. NCAA*, 2025 WL 3140840 (W.D. Wash. Nov. 10, 2025), where a district judge transferred a student-athlete's challenge to the NCAA's four-seasons rule and redshirt rules to *Patterson v. NCAA*, Case No. 3:25-cv-00994 (M.D. Tenn.). There, the court found (and the student-athlete conceded) that the student-athlete was a member of the putative class in *Patterson*, and that he would be unable to opt out of the class under Rule 23(b)(2). *Manu*, 2025 WL 3140840, at *2. The Court is not convinced that *Manu* has any persuasive effect on what it must do with these cases today.

The NCAA doesn't state to which Tennessee Action the Court should transfer the present actions—just that the Court should transfer them "to the Middle District of Tennessee." Dkt. 17, at 9. Although it appears that *Pavia v. NCAA*, Case No. 3:24-cv-01336 (M.D. Tenn.) involves issues most akin to those raised here, the NCAA doesn't argue Plaintiffs are members of a class in *Pavia*, nor that Plaintiffs would be unable to opt out of a settlement reached in *Pavia* (or any of the Tennessee Actions). Although there appears to be some similarity between *Pavia* and the present actions, the NCAA has not shown the parties are substantially similar, and transfer is not warranted.

Furthermore, even if the Court found the parties in the present actions and the Tennessee Actions are substantially similar, transferring the cases to the Middle District of Tennessee at this stage in the proceedings would be inequitable. The 2026–27 Division I football season is underway, and transferring the cases risks delaying an answer as to

whether Plaintiffs may participate this season while their lawsuits are pending.

*2. The* House *Settlement*

Next, the NCAA argues Plaintiffs' claims are barred by the *House* Settlement. The *House* Settlement was a landmark settlement approved on June 6, 2025, among the NCAA and current and former Division I student athletes that created a mechanism for Division I schools to revenue share with their student-athletes, if they opt-in to the settlement. ISU initially decided to opt out of the *House* Settlement, but later decided to opt in. *See* Brad Bugger, *Commentary: ISU Pays to Stay in the Game*, Idaho State J. (Dec. 18, 2025), https://www.idahostatejournal.com/sports/commentary-isu-pays-to-stay-in-the-game/article_f75efdd6-8928-49db-b707-924cb589ef9f.html.

As part of the *House* Settlement, current and future class members agreed to release certain claims against the NCAA, including claims concerning "NCAA . . . rules governing the number of seasons/length of time student-athletes are eligible to receive benefits, including scholarships and payments pursuant to the Injunctive Relief Settlement, including without limitation any rule capping the number of years a student-athlete may receive payments at four years, and providing that all four of those years must be played within a consecutive five-year period." Dkt. 17-3, at 774–75.

Although Plaintiffs were members of the ISU football team at the time ISU opted into the *House* Settlement, it is unclear whether they are actually members of the purported *House* class. But even if they are, Plaintiffs do not challenge the number of years a student-athlete is eligible to receive benefits—they challenge the practice of counting years spent at JUCO toward those years of eligibility so that they can receive the same years of benefits

in Division I as their fellow student-athletes. Plaintiffs do not request more than four years of eligibility to receive benefits, nor are they challenging the number of seasons or length of time student-athletes are eligible to compete in Division I (capped at four seasons over five consecutive years). The settlement does not purport to foreclose challenges to the Bylaws that treat certain student-athletes (*i.e.*, former JUCO student-athletes) differently than their fellow student-athletes, and the NCAA does not cite any case that has dismissed such challenges to the Bylaws because they are barred by the *House* Settlement.

But even if the NCAA is right—that the *House* Settlement release encompasses Plaintiffs' claims— there are, at a minimum, serious questions as to whether the JUCO eligibility limitation in the Five-Year Rule falls within the "Related Injunctive Relief NCAA & Conference Rules" definition. *Id*. Thus, denial of the Motions on this ground is not warranted.

*3. The Sherman Act*

The Sherman Act, 15 U.S.C. § 1, prohibits "unreasonable restraints on trade." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984). The Sherman Act only applies to rules that are "commercial in nature." *Worldwide Baseball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 958 (6th Cir. 2004). To succeed on a Sherman Act claim, a plaintiff must establish the NCAA has "unreasonably restrained trade in the relevant market." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003).

The NCAA's restraints on trade are reviewed under the rule of reason analysis framework. *NCAA v. Alston*, 594 U.S. 69, 96–97 (2021); *Blythe*, -- F.4th --, 2026 WL

2653349, at *5. The rule of reason analysis is "a three-step, burden-shifting framework for distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Blythe*, -- F.4th --, 2026 WL 2653349, at *5 (citation modified). Under this framework, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). "Should the plaintiff carry that burden, the burden then shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant can make that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Alston*, 594 U.S. at 96–97 (citation modified) (quoting *Am. Express Co.*, 585 U.S. at 541–42).

*i. The Five-Year Rule's Commercial Status*

Post *Blythe*, the Ninth Circuit treats the Five-Year Rule as a commercial restraint subject to the Sherman Act. *See Blythe*, -- F.4th --, 2026 WL 2653349, at *4. This is consistent with what all other circuit courts that have considered the issue have decided. *See Robinson v. NCAA*, 172 F.4th 271, 289 (4th Cir. 2026) (joining other appellate courts in concluding post-*Alston* that the NCAA's eligibility rules are subject to the Sherman Act) (citing *Elad v. NCAA*, 160 F.4th 407, 414-15 (3rd Cir. 2025); *Fourqurean v. NCAA*, 143 F.4th 859, 863 (7th Cir. 2025)). The Court need not address this issue further.[6]

[6] In its response brief, the NCAA relied on *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), to argue that Ninth Circuit precedent required this Court to find that rules limiting the number of years student-athletes may play collegiate sports are eligibility rules that do not raise antitrust concerns. The NCAA's response brief came before the Ninth Circuit's ruling in *Blythe*; however, its supplemental brief failed to acknowledge that the Ninth Circuit rejected this very argument. *See Blythe*, -- F.4t --, 2026 WL 2653349,

*ii. The Relevant Market*

Also before applying the rule of reason analysis, the Court must define the relevant market. *Fourqurean v. NCAA*, 143 F.4th 859, 869 (7th Cir. 2025) (stating that determining the relevant market and defendant's market share are "threshold issues"). Failing to define the relevant market is grounds for denying a request for injunction.[7] *See Elad*, 160 F.4th at 416 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market.").

The relevant market is "the area of effective competition," meaning "the arena within which significant substitution in consumption or production occurs." *Id.* (quoting *Ohio v. American Express Co.*, 585 U.S. 529, 543 (2018)). "In the labor market context, the market is comprised of those employers seen by workers as reasonably good substitutes." *Robinson*, 172 F.4th at 293 (citing *Fourqurean*, 143 F.4th at 869). The relevant market also "encompasses notions of geography," and a "geographic market extends to the 'area of effective competition' where buyers can turn for alternate sources of supply." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988) (quoting *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977)). And it "must

at *3 n.3 (finding the NCAA's non-commercial argument under *O'Bannon* relied on dicta and was not the holding in that decision). Even before *Blythe*, this Court was doubtful that *O'Bannon* controlled the issue here due to the vastly different environment Division I student-athletes live in today—namely the ability to participate in a lucrative labor market. *See Elad*, 160 F.4th at 415 ("'If market realities change, so may a legal analysis' or legal precedent.") (quoting *Alston*, 594 U.S. at 99)). To dispel any lingering doubt, *O'Bannon* does not support the NCAA's position and does not control here.

[7] Several appellate courts have overturned injunctions because the lower courts failed to define the relevant market altogether, *see Elad*, 160 F.4th at 416–17, or failed to engage in a fact-specific analysis of the relevant market, *see Robinson*, 172 F.4th at 294; *Fourqurean*, 143 F.4th at 869–70 (finding the district court relied on the incorrect market).

'correspond to the commercial realities of the industry.'" *Am. Express Co.*, 585 U.S. at 544 (citation modified). This requires more than a "cursory analysis of the relevant market." *Blythe*, -- F.4th --, 2026 WL 2653349, at *6; *see also Am. Express Co.*, 585 U.S. at 541 ("The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." (citation modified)); *Alston*, 594 U.S. at 93 ("Whether an antitrust violation exists necessarily depends on a careful analysis of market realities. If those market realities change, so may the legal analysis.").

Plaintiffs offer two market definitions: a "general labor market" composed of "student-athletes who provide competitive football services for colleges, universities, and other institutions;" and a "submarket" composed of "student-athletes who are seeking to provide competitive football services for Division I member institutions." Dkt. 2-1, at 10. Plaintiffs argue this is the relevant market because Division I member institutions "are the buyers of what student-athletes sell—their football services," and that "the Five-Year Rule is specifically applied to those member institutions and student-athletes who are seeking to compete in Division I athletics." Dkt. 2-1 at 10. As support for their definitions, Plaintiffs cite to affidavits signed by the head coach at ISU (Dkt. 2-2), an offensive line coach and co-offensive coordinator at ISU (Dkt. 2-3), and Plaintiffs (Dkts. 2-5, -6); and generalized NIL and earnings data for Division I student athletes (Dkt. 2-7, at Exs. E–G).

Under *Blythe*, it is unlikely Plaintiffs have proffered sufficient evidence for this Court to define the relevant market. In *Blythe*, to support his market definition as being the collegiate baseball labor market, the plaintiff submitted (1) a report that provided

generalized statistics about the state of the NIL market, (2) evidence showing that 71 percent of the 2025 MLB Draft picks were from Division I schools, and (3) an affidavit by the plaintiff for the fact that despite playing at NAIA and Division II programs, he was never offered an NIL opportunity. -- F.4th --, 2026 WL 2653349, at *6–7. The Ninth Circuit found this market evidence was "paltry" and fell "far short of what is necessary under Supreme Court authority." *Id.* at *6. The circuit court found the report, evidence of MLB draft picks, and the plaintiff's personal experience in collegiate sports "presented no evidence regarding how to define the relevant labor market as a whole, including any concrete demonstration of what other employers might be acceptable or unacceptable substitutes (*e.g.*, professional baseball leagues or other college baseball leagues)." *Id.* at *7.

In the case at hand, Plaintiffs argue their proffered evidence "far surpasses the amount of information Blythe provided the Ninth Circuit." Dkt. 20, at 2. While it is true Plaintiffs submitted slightly more evidence than did the plaintiff in *Blythe* (in the form of two additional affidavits from ISU football coaches), the Court is not persuaded those are the type of substantive, concrete evidence required to allow it to perform a "careful analysis of market realities." *See Blythe*, -- F.4th --, 2026 WL 2653349, at *7 (citing *Alston*, 594 U.S. at 93). The personal experiences of two coaches and two players from the same Division I school cannot be attributed to all Division I football programs such that a "fact-specific assessment of market power and market structure" may be conducted. *Am. Express Co.*, 585 U.S. at 541. Furthermore, the NIL market data submitted by Plaintiffs is similarly inadequate because "it does not address market dynamics, the relevant market participants,

or whether any market participants are employers seen as reasonably good substitutes." *Blythe*, -- F.4th --, 2026 WL 2653349, at *6.

To their credit, prior to *Blythe*, Plaintiffs' uncontested argument that the NCAA enjoys monopsony power over the market for college athletics and the Bylaws are a horizonal restraint on trade would likely have permitted the Court to accept their proffered market definition. *See Martinson v. NCAA*, 804 F. Supp. 3d 1109, 1125–26 (D. Nev. 2025), *opinion vacated by Braham*, -- F.4th --, 2026 WL 2653095, at *4. However, in *Blythe* the Ninth Circuit specifically rejected such argument for a lesser market definition requirement. *Blythe*, -- F.4th --, 2026 WL 2653349, at *7 (finding that regardless of horizontal restraints on trade, "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities." (citing *Alston*, 594 U.S. at 93)). Unfortunately for Plaintiffs, there is no instant replay on the Ninth Circuit's decision, and not even one second of time will be added to their game clocks.

Because Plaintiffs failed to provide sufficient evidence to define the relevant market, the Court is unable to perform a rule of reason analysis. *See id.* at *5 ("Without defining the relevant market, 'there is no way to measure the defendant's ability to lessen or destroy competition.'" (quoting *Am. Express Co.*, 585 U.S. at 543)).[8] Accordingly, Plaintiffs are not likely to succeed on the merits of their Sherman Act claims.

[8] Even if Plaintiffs had provided sufficient evidence to define the relevant market, under *Blythe* they likely would have failed to meet their burden to prove the Five-Year Rule has a substantial anticompetitive effect in the relevant market because they rely on the same affidavits to show anticompetitive effect. *See Blythe*, -- F.4th --, 2026 WL 2653349, at *7 ("That [plaintiff] was personally injured by [Bylaw 12.6] does not evidence the rule's anticompetitive effect on the market as a whole.").

### C. Remaining *Winter* Factors

Because the Court finds that Plaintiffs are unlikely to succeed on the merits, the Court need not address the remaining *Winter* factors. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) ("[I]f a movant fails to meet this threshold inquiry [of likelihood of success on the merits], the court need not consider the other factors." (citation modified)).

### D. The Rule of Restitution and Bond

Because the Court is not granting the Motions, it need not address the rule of restitution and bond.

## V. CONCLUSION

For the reasons set forth above, the Court finds Plaintiffs are not entitled to preliminary relief. Plaintiffs have not shown a likelihood of success on their Sherman Act claim. Specifically, Plaintiffs have provided insignificant evidence to meet their burden under *Blythe*. Plaintiffs must submit substantive, concrete evidence sufficient for the Court to define the relevant market and perform a careful analysis of market realities.

This Court is required to follow the rule of law. *United States v. Gonzalez-Sanchez*, 398 F. Supp. 3d 794, 799 (D. Idaho 2019) ("Once a federal circuit court issues a decision, the district courts within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority."). On the issues presented in this case, the rule of law is *Blythe.* The Court may not agree with *Blythe;* however, *Blythe* is now the precedent in the Ninth Circuit, and this Court must follow it.

## VI. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. The Motions for Preliminary Injunction (Dkt. 2; *Tu'akoi* Dkt. 5) are **DENIED**.[9]

DATED: September 22, 2026

David C. Nye
U.S. District Court Judge

[9] Moving forward, the parties should consider consolidating these cases to further the purposes of Federal Rule of Civil Procedure 1.